COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO.
02-12-00141-CV

 

 


 
 
 In
 the Interest of S.I.-M.G. and S.B.G.-R.,
 the Children
  
  
  
  
  
  
 
 
 §
  
 §
  
 §
  
 §
  
  
 
 
 From
 the 431st District Court
  
 of
 Denton County (2010-11061-16)
  
 November
 15, 2012
  
 Opinion
 by Justice Walker
 
 


 

JUDGMENT

 

         
This court has considered the record on appeal in this case and holds that
there was no error in the trial court’s judgment.  It is ordered that the
judgment of the trial court is affirmed. 

 

 

SECOND DISTRICT COURT OF APPEALS 

 

 

 

By_________________________________

   
Justice Sue Walker

 

 

 


 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO.
02-12-00141-CV

 

 


 
 
 In the Interest of S.I.-M.G.
 and S.B.G.-R., the Children
 
 
  
 
 
  
 
 
 
 
  
 
 
 
 
  
 
 
  
 
 
  
 
 


 

----------

FROM THE 431st District Court OF Denton COUNTY

----------

MEMORANDUM
OPINION[1]

----------

I.  Introduction

         
Appellant Mother appeals the judgment following a jury trial in which her
parental rights to S.I.-M.G. and S.B.G.-R. were terminated.  In five issues, Mother argues that
the trial court erred by failing to include her proposed jury instruction to
disregard the wealth of the parties, that the trial court erred by including
jury questions on section 161.001(1)(D) and (E) endangerment grounds because
there was no evidence to support them, that there was no evidence that Mother
had failed to complete the services on her service plan, and that the attorney
ad litem had failed to present S.I.-M.G.’s legal
position to the trial court.  We will affirm.

II.  Factual Background

         
The
voluminous reporter’s record, which includes over 2,000 pages of testimony and
six volumes of exhibits, reveals a history of drug abuse that has,
unfortunately, plagued Mother and her family for decades.  Because the
appeal can be disposed of based on Mother’s conduct and because the sufficiency
of the evidence to support the best interest finding is not challenged, the
facts set forth below focus on Mother’s conduct.

A. 
Mother’s Upbringing

         
Mother and her twin brother started living with their grandmother when they
were four months old because their mother had drug and alcohol issues, and
their father had drug issues.  After Mother’s grandmother died when Mother
was a teenager, Mother lived with her uncle off and on.  Mother attempted
suicide around age sixteen.  Mother admitted to her uncle that she had
used drugs.  The uncle testified that Mother’s mother’s
addiction problems had affected her ability to parent Mother and that he was
fearful that Mother would experience the same problems because of her own
addiction. 

B. 
Mother’s Relationship with Paul and Her Criminal Background

         
Mother dated Paul for a year before she became pregnant with S.I.-M.G. at age eighteen.  Paul was verbally and
emotionally abusive to Mother after he started taking methamphetamine and
abusing nitrous oxide.  Paul told Mother that she had to steal money for
him.  Mother feared Paul because he had previously hurt her “extremely
badly,” requiring her to be sent to the hospital.  So Mother wielded a
pocket knife that Paul had provided and robbed a woman with her seven-year-old
son at an ATM.  Mother also robbed an older woman at NorthPark
Mall.  Mother was arrested for two counts of aggravated robbery and placed
in jail.[2]
 

C. 
First Removal of S.I.-M.G.

         
While Mother was in jail, Steve Buchanan, a detective with the Denton Police
Department who investigated drug-endangered children cases, performed a welfare
check at S.I.-M.G.’s grandmother’s home on January
28, 2008,[3]
because someone had called and reported that S.I.-M.G.
had missed school for a few days.  The grandmother told him that she did
not have transportation to take S.I.-M.G. to school
and that she was caring for S.I.-M.G. because Mother
was in jail.[4]


         
Detective Buchanan testified that he went back to S.I.-M.G.’s
grandmother’s house on February 19, 2008, because he had received a CPS case on
S.I.-M.G. and the CPS report contained allegations
that the grandmother was a prescription drug addict.  The grandmother was
talking very fast and was jumping from subject to subject without being asked
any questions; she was visibly under the influence of drugs.  The
grandmother told Detective Buchanan that she was taking Lortab
and hydrocodone, and he was able to view the bottles.  Each of the two
bottles had been filled seven days prior and contained 180 pills; out of the
total of 360 pills, 50 remained. 

         
The grandmother consented to a search of the house, which turned up a crack
pipe, a green baggie with some white residue, and an empty syringe.  The
crack pipe and the green baggie were located in the master bedroom, which the
grandmother said that she shared with S.I.-M.G.
 The location where the crack pipe was found was not far from a “play”
skillet and was within the child’s reach. The crack
pipe tested positive for cocaine. 

         
CPS made the decision to remove S.I.-M.G. from the
grandmother in February 2008 because of the condition of the grandmother and
because of the crack pipe and baggie that were found in the house and readily
accessible to S.I.-M.G.  Detective Buchanan
testified that a hair follicle test on S.I.-M.G. came
back positive for cocaine.  Detective Buchanan later obtained two warrants
for the grandmother’s arrest for possession of a controlled substance under a
gram and endangering a child, and the grandmother was ultimately
arrested.  

D.  Mother
Receives Probation and the Department 

Returns S.I.-M.G. to Mother

 

         
On June 12, 2008, Mother was placed on probation for ten years.  After
Mother was placed on probation, she diligently worked her service plan, and
S.I.-M.G. was returned to her. 

E. 
Police Arrest Mother’s Boyfriend Chris in Possession of Heroin

         
Sergeant Brad Curtis, who was sergeant over special operations including
narcotics, testified that on September 10, 2010, he had received information
regarding an individual who was possibly trafficking narcotics at the Foxfire
Apartments in the Bell Avenue area.  Sergeant Curtis found Chris, Mother’s
boyfriend, “completely out of it”; he almost fell while walking into the
parking lot.  

         
Sergeant Curtis found a straw and a baggie with a black tar substance in
Chris’s front pocket.  More drug paraphernalia and black tar heroin were
found in Chris’s backpack.  The total black tar heroin was twenty-three
grams, which had an approximate street value of $2,300 and was the largest
amount that Sergeant Curtis had obtained at one time.  Sergeant Curtis
testified that the backpack that Chris was carrying on the day in question was
one that could have been easily opened by a child.  A purse found in the
backpack contained three prescription bottles labeled as belonging to Mother. 

         
Sergeant Curtis spoke with Mother at her apartment, and she said that she had
no knowledge about what was taking place.  Sergeant Curtis said that
Mother was cooperative and that her reaction regarding Chris was,
appropriately, anger.  

F. 
Second Removal of S.I.-M.G.

         
Jennifer Matthews, an investigator with the Department of Family and Protective
Services, testified that after a referral for drug abuse came in to the
Department, she went on September 13, 2010, to the school to speak with S.I.-M.G., who was seven.  S.I.-M.G.
said that Mother, her Uncle Jacob, and her grandmother lived in her home; her
“dad” Chris, who was Mother’s paramour, was no longer living with them because
he had been arrested.  S.I.-M.G. did not know
what drugs were; she said that Chris had been arrested for “heritage” but did
not know what that was.  S.I.-M.G. said that
they do not have many friends that come to the house; Mother usually lays on
the couch most of the time. 

         
Matthews attempted to talk to Mother, but she was not home.  Matthews
received a phone call the following day from the grandmother; Mother was at the
doctor being treated for complications related to her pregnancy.[5]  When Matthews spoke with Mother on
September 14, 2010, the first thing Mother said when Matthews arrived at the
apartment was that she had left her purse at the hospital and did not have her
medicine bottles; Matthews thought this was odd because she had not asked about
Mother’s purse or medicine bottles.[6]
 

         
Mother continued to volunteer information, including that she needed to go see
her therapist and that she did not want Matthews to talk to her probation
officer or CASA because they would be upset that CPS was involved in her life
again.  Matthews testified that Mother’s drug test from the previous night
was positive for amphetamines (in addition to positive for opiates, which she
had a prescription for), but Mother claimed that she had never done speed and
denied having a drug history.  Mother said that she was taking Xanax for
anxiety and Lortab (hydrocodone) for a back injury
that had occurred seven years earlier. Mother’s
hydrocodone prescription allowed her to take two tablets every four hours, but
the prescription was only for twenty pills.  Mother admitted that she had
started using more than she should have of the hydrocodone and Xanax. 

         
Although Mother knew before 2010 that Chris was taking hydrocodone for an
injury and kidney stones, and although Mother had suspicions that Chris had
used drugs, Mother said that there was never any blatant proof of illegal drug
use.  Because Chris had never used heroin in Mother’s presence, Mother did
not believe that Chris was a heroin addict.  Mother said that Chris’s arrest
was a misunderstanding and that the backpack belonged to Chris’s brother.
 But Mother indicated that she understood that Chris could not be around
the family and was not to have contact with S.I.-M.G.
 

         
The grandmother took a drug test that was positive for opiates because she was
on hydrocodone and Xanax, just like Mother.  Fifteen days after the
grandmother’s 120-count bottle of hydrocodone was filled, it contained only
eight pills, even though it should have contained approximately sixty.  The
grandmother said that she put them in a separate container.  Mother and
the grandmother declined to sign a medical release that would have allowed
Matthews to check into their prescriptions. 

         
The next day, on September 15, 2010, Matthews observed Chris leave the
apartment; Mother later said that he had been there for only a few seconds.
 The following day, on September 16, 2010, the Department requested and
received custody of S.I.-M.G.  S.I.-M.G. was removed because Chris had been arrested for drug
use, Chris had not been kept away from S.I.-M.G. as
set forth in the safety plan, and Mother and grandmother were overtaking their
hydrocodone medication.  Matthews testified that Mother’s and
grandmother’s overtaking of hydrocodone affected their brains and the way they
paid attention, which could endanger a child.  After a temporary
placement, S.I.-M.G. was placed with the foster
family who had cared for her after she was removed from grandmother’s home in
2008.

G. 
Department Removes S.B.G.-R. After
She Is Born Addicted

         
On September 19, 2010, Mother went into labor at 34.5 weeks and delivered S.B.G.-R.[7]
 Mother warned the nurses that S.B.G.-R. would be born addicted, and the Department ultimately
received a referral because S.B.G.-R. tested positive for benzodiazepine and opiates.
 Angela Evans, a nurse in the NICU at
Presbyterian Hospital of Denton, testified that she cared for S.B.G.-R. after she was born
addicted to opiates and “benzoids.”  S.B.G.-R.’s withdrawal score was twenty-two, which was a
very high score; Evans had never seen a score that high before.  S.B.G.-R.’s withdrawal symptoms included a very irritable
cry; stiffness in her lower legs; jitteriness; an inability to sleep for three
hours between feedings; trouble eating;[8]
loose, watery stools; and emesis (vomiting). S.B.G.-R. received methadone orally every six hours to help
with the withdrawal symptoms.  S.B.G.-R.
remained in the NICU for approximately five weeks.
 Upon her discharge, S.B.G.-R.
was placed with Chris’s parents and continued on Phenobarbital to help
with the remaining withdrawal symptoms, which included irritability. 

H. 
Mother’s Drug Evaluation at First Step

         
Cheryl Crosley-Culberson, the clinical director with
First Step Denton County Outreach, testified that Mother underwent an
evaluation on October 7, 2010, and told her that she had started drinking
alcohol at age sixteen but had not consumed alcohol since 2009, other than
social, occasional usage.  Mother told Crosley-Culberson
that her first and last use of methamphetamine occurred at age twenty-four and
was experimental.  Mother had experimented once with the following
drugs:  ecstasy, marijuana, cocaine, LSD, and heroin.  Mother listed
that she was taking ten to twenty-five milligrams of Narcan,
an opiate, on a daily basis for back pain and that she was taking Zantac and Celexa.  Crosley-Culberson
testified that Narcan is a highly addictive drug.
 Mother did not tell Crosley-Culberson that she
had recently delivered a child on September 19, 2010.[9]  Based on the information received,
Mother’s diagnostic impression was cocaine abuse and heroin abuse.  Even
though Mother had noted only “experimental” use of these drugs, Crosley-Culberson reached that diagnostic impression after
reviewing Mother’s legal history and her current CPS situation.  

I. 
Mother’s Service Plan

         
Brittany Nichols, a former caseworker with CPS, testified that she went over
the service plan with Mother on October 15, 2010.  Mother was allowed a
two-hour weekly visit with the children, and the Department had trouble getting
her to leave at the end of each visit because she wanted to stay longer.  Nichols
noted that this made it difficult on S.I.-M.G. 

         
Nichols tested Mother five times for drugs, and every time she was positive for
opiates and “benzos.”  Nichols lost contact with
Mother in November 2010 and later learned that she had been arrested on a
probation violation for testing positive for drugs. 

J. 
Mother’s Counseling

         
Brandy Pounds, a licensed professional counselor who had started seeing Mother
in 2009 while she was on probation with Denton County, testified that Mother
told her in April 2010 that she was pregnant.  At that time, Mother’s
situation “was kind of ambiguous”; she was struggling in her relationship,[10] with career choices, and with her
family.  Mother admitted that she was physically addicted to Lortab and Xanax.  Mother did not want to be on the
medications, but she was fearful of stopping them due to the physical
withdrawals that would occur.  Mother was remorseful that S.B.G.-R. was born addicted to
drugs.  Mother told Pounds that she did not refill the prescriptions after
she gave birth. 

         
During random drug tests, Pounds testified that Mother had tested positive for
hydrocodone.  Pounds said that in a drug test, both hydrocodone and heroin
come back as opiates. 

         
Mother last saw Pounds in November 2010 because the probation department
notified Pounds that they would no longer fund the counseling.  It
surprised Pounds that Mother’s probation was revoked in November 2010 after a
hair strand of Mother’s tested positive for heroin.  Pounds testified that
“heroin wasn’t even an issue we were treating [Mother] for.”  

K. 
Mother’s Probation Revoked After Positive Drug Test

         
Mother’s probation was revoked in early November 2010 because Mother tested
positive for heroin.  Mother was placed in jail in Dallas County.
 While she was in jail, Mother wrote a letter to Chris telling him which
drugs he could take that would not show up on a urinalysis.  Mother was
later transferred to SAFPF (substance abuse felony
prison facility). 

L. 
Chris’s Second Drug Arrest

         
Shane Norie, an investigator with the Denton County
Sheriff’s Office’s narcotics unit, testified that he was an undercover officer
who worked to dismantle drug organizations, including the one that Chris was a
part of.  Norie arrested Chris on May 19, 2011.
 Norie testified that Chris had “a substantial
impact” on the Denton area because he was selling quite a bit of black tar
heroin. Norie testified that
Chris had sold three grams a week for approximately a month, then he sold six
grams for about two weeks, and then he started selling ounces.
Chris told Norie that he was using heroin
daily.  Norie testified that in this scenario,
he would find it hard to believe that Mother did not know that Chris was using
heroin.  Norie said that if Mother was also on
drugs, it might cause her not to recognize that Chris was on drugs.  Norie testified that the use of heroin impacts the ability
to parent and is endangering to a child and that a drug environment filled with
addicts is dangerous to a child even if no dope is present.[11]  

M. 
Mother’s Time in SAFPF the Halfway House

         
Mike Storm, a Dallas County adult probation officer, testified that SAFPF is a treatment center inside the Texas Department of
Corrections where people who have chemical addictions are sent for ninety days
to a year.  When they are released, they check into TTC,
which is a transitional treatment center for ninety days.  After that,
they go into aftercare treatment for six to nine months, during which time they
attend after care twice a week, attend two NA/AA meetings per week, visit their
probation officer twice a month, and attend individual counseling twice a
month. 

         
Storm testified that Mother had entered the Henley Unit on April 1, 2011; was
released on December 28, 2011; and entered the TTC
program at the Salvation Army that same day.  While Mother was at the
Salvation Army she was required to maintain her recovery by attending AA/NA
meetings, undergoing counseling, seeking employment, starting a savings
account, obtaining a twelve-step sponsor for her AA/NA meetings, securing
housing, and figuring out transportation.  Mother was compliant on the program;
she had submitted urinalyses that were negative.[12]  While Mother was at the halfway
house, she requested to resume visits with her daughters, but visits were not
authorized. 

         
Glenda Hood, who was Mother’s sponsor in her recovery program, testified that
she met with Mother three or four times a week at the Salvation Army.
 Mother told Hood that she “was hooked on prescription pills while she was
pregnant” and heroin.  Hood testified that Mother is “doing the program”
and “receiving treatment well, and she has some issues that she needs to deal
with.”  According to Hood, Mother is making progress on her
decision-making skills, but the real test will occur when she is released.[13] 

         
Mother was set to complete the TTC program on March
28, 2012, which was two weeks after the termination trial.  But if Mother
was not able to finish the program’s requirements, her stay could be extended a
few days in order to meet the CJAD[14] requirements.  After Mother
completes the six to nine months in TTC, she will
return to regular case load and report to her probation officer once a month
until 2018. 

N. 
Mother’s Testimony

         
Mother testified that she did not know that she was pregnant for the first four
months of her pregnancy with S.B.G.-R.  During
the early stages of the pregnancy, Mother did not talk to her doctor about
being dependent on prescriptions because she did not know that she was pregnant
until she was four months’ pregnant; Mother admitted that her delay caused a
lot of problems for her.  Mother also admitted that she had abused drugs
for a long time and that when she learned that she was pregnant with S.B.G.-R., she was scared because she knew that she was
physically addicted to Lortab and Xanax.  Mother
testified that she had abused prescription drugs during the first trimester,
which is critical to a baby’s development.  Mother expressed having a
“tremendous amount of guilt and shame” for putting S.B.G.-R. through withdrawal because Mother described her own
experience of going through withdrawals as “horrible” and stated that she would
rather die than go through it again. 

O. 
Disposition

         
After hearing the evidence above, the jury answered “yes” to every dispositive
question.  The trial court thereafter signed a judgment terminating
Mother’s parental rights to S.I.-M.G. and S.B.G.-R. based on Texas Family
Code section 161.001(1)(D), (E), and (O) and section 161.001(2).  This
appeal followed.

III.  Burden of Proof
in Termination Cases

A
parent’s rights to “the companionship, care, custody, and management” of his or
her children are constitutional interests “far more precious than any property
right.”  Santosky v. Kramer, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397
(1982); In re M.S., 115 S.W.3d 534, 547 (Tex.
2003).  “While parental rights are of constitutional magnitude,
they are not absolute.  Just as it is imperative for courts to recognize
the constitutional underpinnings of the parent-child relationship, it is also
essential that emotional and physical interests of the child not be sacrificed
merely to preserve that right.”  In re C.H.,
89 S.W.3d 17, 26 (Tex. 2002). In
a termination case, the State seeks not just to limit parental rights but to
erase them permanently—to divest the parent and child of all legal rights,
privileges, duties, and powers normally existing between them, except for the
child’s right to inherit.  Tex. Fam. Code Ann.
§ 161.206(b) (West 2008); Holick v.
Smith, 685 S.W.2d 18, 20 (Tex. 1985). 
We strictly scrutinize termination proceedings and strictly construe
involuntary termination statutes in favor of the parent.  Holick,
685 S.W.2d at 20–21; In re R.R., 294 S.W.3d 213, 233 (Tex. App.—Fort Worth 2009, no pet.).

In
proceedings to terminate the parent-child relationship brought under section
161.001 of the family code, the petitioner must establish one ground listed
under subsection (1) of the statute and must also prove that termination is in
the best interest of the child.  Tex. Fam. Code Ann.
§ 161.001 (West Supp. 2012); In re J.L.,
163 S.W.3d 79, 84 (Tex. 2005).  Both
elements must be established; termination may not be based solely on the best
interest of the child as determined by the trier of fact.  Tex. Dep’t
of Human Servs. v. Boyd,
727 S.W.2d 531, 533 (Tex. 1987); In re D.T.,
34 S.W.3d 625, 629 (Tex. App.—Fort Worth 2000, pet.
denied) (op. on reh’g).

Termination
decisions must be supported by clear and convincing evidence.  Tex. Fam.
Code Ann. § 161.001; see also § 161.206(a).  Evidence is clear
and convincing if it “will produce in the mind of the trier of fact a firm
belief or conviction as to the truth of the allegations sought to be
established.”  Id. § 101.007 (West 2008). 
Due process demands this heightened standard because termination results in
permanent, irrevocable changes for the parent and child.  In re J.F.C., 96 S.W.3d 256, 263
(Tex. 2002); see In re J.A.J., 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for
termination and modification).

IV.  Alleged Jury
Charge Errors

A.  Evidence
Supports Submission of Jury Question on Endangering Conduct—Section 161.001(1)(E) Grounds

 

In
her fourth issue, Mother argues that the trial court erred by including jury question
six, which asked the jury, “Do you find by clear and convincing evidence that
the mother, . . . , has engaged in conduct, or knowingly placed the child with
persons who engaged in conduct, which endangered the physical or emotional
well-being of the child [S.B.G.-R.]?”  Mother’s
argument under her fourth issue is two-fold:  she argues (1) that there is
no evidence to support the inclusion of jury question six because if a child is
born addicted to a controlled substance legally obtained by prescription, that
is not a ground for termination under section 161.001(1)(R) and (2) that there
is no evidence to support the inclusion of jury question six because S.B.G.-R. was removed at birth and
was therefore under the complete care and control of the Department, not
Mother. 

The
standard of review in determining whether sufficient evidence supports
submission of a jury question is different from the standard of review that we
apply in reviewing the sufficiency of the evidence to support a jury’s finding
in a termination trial.  The former requires only more than a scintilla of
evidence, while the latter must be supported by clear and convincing evidence.[15] 
Because Mother challenges the evidence to support submission of jury question
6, not the sufficiency of the evidence to support the jury’s answer to jury
question 6, we apply the jury charge standard of review.

An
objection to the submission of a question in the court’s charge on evidentiary
grounds is a challenge to the legal sufficiency of the evidence.  Elbaor, 845 S.W.2d
at 243.  We may sustain a legal sufficiency challenge only when (1)
the record discloses a complete absence of evidence of a vital fact; (2) the
court is barred by rules of law or of evidence from giving weight to the only
evidence offered to prove a vital fact; (3) the evidence offered to prove a
vital fact is no more than a mere scintilla; or (4) the evidence establishes
conclusively the opposite of a vital fact.  Uniroyal Goodrich Tire Co.
v. Martinez, 977 S.W.2d 328, 334 (Tex. 1998), cert.
denied, 526 U.S. 1040 (1999); Robert W. Calvert, “No Evidence” and
“Insufficient Evidence” Points of Error, 38 Tex. L. Rev. 361, 362–63
(1960).  In determining whether there is legally sufficient evidence to
support the finding under review, we must consider evidence favorable to the
finding if a reasonable factfinder could and
disregard evidence contrary to the finding unless a reasonable factfinder could not.  Cent.
Ready Mix Concrete Co. v. Islas, 228 S.W.3d 649, 651 (Tex. 2007); City of Keller v.
Wilson, 168 S.W.3d
802, 807, 827 (Tex. 2005).  Anything more than a
scintilla of evidence is legally sufficient to support the finding.  Cont’l Coffee Prods. Co., 937 S.W.2d at 450; Leitch
v. Hornsby, 935 S.W.2d
114, 118 (Tex. 1996).  More than a scintilla of evidence
exists if the evidence furnishes some reasonable basis for differing
conclusions by reasonable minds about the existence of a vital fact.  Rocor
Int’l, Inc. v. Nat’l Union Fire Ins. Co., 77 S.W.3d
253, 262 (Tex. 2002).

Endanger
means to expose to loss or injury or to jeopardize.  Boyd, 727 S.W.2d at 533; In re J.T.G.,
121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no
pet.); see also In re M.C., 917 S.W.2d 268,
269 (Tex. 1996).  It is not necessary to establish that a parent intended
to endanger a child in order to support termination of the parent-child
relationship under subsection (E).  See M.C., 917
S.W.2d at 270.  To prove
endangerment under subsection 161.001(1)(E), the relevant inquiry is whether
evidence exists that the endangerment of the child’s physical well-being was
the direct result of the parent’s conduct, including acts, omissions, or
failures to act.  J.T.G., 121 S.W.3d at 125.  Courts
may look to parental conduct both before and after the child’s birth.  In re J.O.A., 283 S.W.3d 336, 345 (Tex. 2009).  The conduct need
not occur in the child’s presence, and it may occur “both before and after the
child has been removed by the Department.”  Walker v.
Tex. Dep’t of Family & Protective Servs., 312
S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009,
pet. denied).  Moreover, termination under subsection 161.001(1)(E) must be based on more than a single act or omission; a
voluntary, deliberate, and conscious course of conduct by the parent is
required.  Tex. Fam. Code Ann. § 161.001(1)(E);
J.T.G., 121 S.W.3d
at 125. 

The
specific danger to the child’s well-being may be inferred from parental
misconduct standing alone.  Boyd, 727 S.W.2d
at 533; In re R.W., 129 S.W.3d 732, 738 (Tex.
App.—Fort Worth 2004, pet. denied).  As a general rule, conduct that
subjects a child to a life of uncertainty and instability endangers the
physical and emotional well-being of a child.  R.W., 129 S.W.3d at 739.  The
Supreme Court of Texas has acknowledged that “a parent’s use of narcotics and
its effect on his or her ability to parent may qualify as an endangering course
of conduct.”  J.O.A., 283 S.W.3d at 345.  The
Houston First Court of Appeals has explained that illegal drug use may support
termination under section 161.001(1)(E) because “it
exposes the child to the possibility that the parent may be impaired or
imprisoned.”  Walker, 312 S.W.3d
at 617.  Additionally, illegal drug use during pregnancy can
support a charge that the mother has engaged in conduct that endangers the
physical and emotional welfare of the child.  In re M.L.B.,
269 S.W.3d 757, 760 (Tex. App.—Beaumont 2008, no pet.) (citing Dupree v. Tex. Dep’t
of Protective & Regulatory Servs., 907 S.W.2d 81, 84 (Tex. App.—Dallas 1995, no writ)). 
Further, a parent’s decision to engage in illegal drug use during the pendency
of a termination suit, when the parent is at risk of losing a child, supports a
finding that the parent engaged in conduct that endangered the child’s physical
or emotional well-being.  In re M.E.-M.N.,
342 S.W.3d 254, 263 (Tex. App.—Fort Worth 2011, pet.
denied).

Turning
to an analysis of the evidence to support the submission of jury question six,
we note that the Department abandoned subsection 161.001(1)(R) as a ground for
terminating Mother’s parental rights to S.B.G.-R. and proceeded under subsection (E), among other grounds.
 Under subsection (E), as set forth above, evidence of Mother’s drug use,
both overuse of prescription medications and use of illegal drugs, may be
considered in determining whether some evidence exists to support submission of
question six—section 161.001(1)(E) grounds—to the jury.  Compare
Tex. Fam. Code Ann. § 161.001(1)(R), with id. § 161.001(1)(E);
compare also In re P.K.C., No. 02-08-00060-CV,
2009 WL 279337, at *3 (Tex. App.—Fort Worth Feb. 5, 2009, no pet.) (mem. op.) (considering
test results showing that child was born with cocaine in her bodily fluids in
analyzing trial court’s subsection (R) finding), with J.O.A.,
283 S.W.3d at 345 (holding that “a parent’s use of
narcotics and its effect on his or her ability to parent may qualify as an
endangering course of conduct” under subsection (E) ground), In re T.D.L., No. 02-05-00250-CV, 2006 WL 302126, at *7–8
(Tex. App.—Feb. 9, 2006, no pet.) (mem.
op.) (considering mother’s continuous abuse of
prescription drugs in analyzing trial court’s subsection (E) finding), and
In re M.Y., No. 02-07-00186-CV, 2008 WL 204618,
at *10 (Tex. App.—Fort Worth Jan. 24, 2008, no pet.) (mem. op.) (considering
mother’s continuous abuse of both prescription and illegal drugs in analyzing
trial court’s subsection (E) finding).[16]

Because
case law provides that, in evaluating a parent’s conduct under subsection (E),
the conduct need not occur in the child’s presence, and it may occur “both
before and after the child has been removed by the Department,” we need not, as
Mother suggests, focus solely on Mother’s conduct after S.B.G.-R. was removed by the Department.  See Walker,
312 S.W.3d at 617. 
Looking to Mother’s conduct while she was pregnant with S.B.G.-R.,
Mother testified that she had abused Xanax and hydrocodone during the first
trimester, which was during a critical stage of S.B.G.-R.’s
development.  Although as Mother points out, Mother’s doctor continued to
prescribe Xanax and hydrocodone for her during her pregnancy with S.B.G.-R., Mother did not know or reveal to her doctor that
she was pregnant until she was four months’ pregnant.  The record also
reveals that throughout her pregnancy, Mother not only continued to take the
prescriptions in the prescribed dosage but also that Mother abused the
prescriptions, exceeding the dosage prescribed by the doctor, which endangered S.B.G.-R. and contributed to S.B.G.-R.’s addiction to opiates and benzodiazepines. 
As set forth above, S.B.G.-R.
remained in the hospital for five weeks after birth while she was on
methadone for withdrawals, and when she was released, she continued on
Phenobarbital for the remaining withdrawal symptoms.  This evidence
constitutes more than a scintilla of evidence to support the inclusion of jury
question six regarding Mother’s endangering conduct toward S.B.G.-R. 
Accord M.E.-M.N.,
342 S.W.3d at 262–64 (holding evidence legally
sufficient to support factfinder’s firm conviction or
belief that appellant had engaged in conduct that endangered child because
appellant had abused prescription drugs, along with testing positive for
cocaine or methamphetamine); In re V.R., No.
02-09-00001-CV, 2009 WL 2356906, at *6 (Tex. App.—Fort Worth July 30, 2009, no
pet.) (mem. op.) (holding evidence sufficient to support trial court’s
endangerment findings based on mother’s drug history and her drug use before
and during the termination proceedings, regardless of the medical reasons for
which she claimed she took the drugs; mother had taken Vicodin
while pregnant and tested positive for the drug at child’s birth and at times
after birth, which showed a continuing course of conduct); T.D.L.,
2006 WL 302126, at *7–8 (holding evidence legally sufficient to support trial
court’s subsection (E) finding because evidence revealed that mother had
continuously abused prescription drugs).

Even
without the evidence of Mother’s prescription drug use in excess of the prescribed
dosage, the evidence is sufficient to support the inclusion of jury question
six because there was evidence that Mother had used heroin before and after S.B.G.-R. was born.  Glenda
Hood, Mother’s sponsor at the Salvation Army, testified that Mother had told
her that she had used heroin while pregnant with S.B.G.-R. 
Additionally, Mother’s evaluation at First Step Denton County Outreach in
October 2010 showed that Mother had abused cocaine and heroin.  And in
early November 2010, approximately six weeks after S.B.G.-R. was born, Mother’s probation was revoked after a hair
strand test came back positive for heroin; Mother thereafter spent time in SAFP and in a halfway house and was still living at the
halfway house during the termination trial.  The above is some evidence
that Mother’s continuous, voluntary, deliberate, and conscious course of
conduct—that is, using illegal drugs during her pregnancy and after her
children had been removed, as well as spending time in jail—subjected S.B.G.-R. to a life of uncertainty
and instability and supported the inclusion of jury question six that Mother
had engaged in conduct that had endangered S.B.G.-R.’s
physical or emotional well-being.  We therefore hold that more than a
scintilla of evidence exists to support the submission of the section 161.001(1)(E) endangering conduct question to the jury.  See,
e.g., Patlyek v. Brittain,
149 S.W.3d 781, 789 (Tex. App.—Austin 2004, pet.
denied) (holding that there was some evidence to support the submission of the
past physical impairment element of damages); see also In re D.J.W., No. 01-11-00703-CV, 2012 WL 3525542, at *9
(Tex. App.—Houston [1st Dist.] Aug. 16, 2012, no pet. h.) (holding evidence legally sufficient to support
finding that mother used illegal narcotics before and after child was taken
into custody by Department and that mother’s drug use endangered the physical
or emotional well-being of child by exposing him to risks that mother would be
impaired or imprisoned); M.L.B., 269 S.W.3d at 760 (holding evidence sufficient to establish
grounds for termination because mother had a long history of drug abuse and
knew she was pregnant when she consumed controlled substances).[17] 
We overrule Mother’s fourth issue.[18]

B.  No Charge
Instruction Required on Wealth; Ability to Provide Necessities Is Proper
Consideration in Best Interest Analysis

 

         
In her first issue, Mother argues that the trial court abused its discretion by
failing to instruct the jury that they should disregard the relative wealth of
Mother compared to the proposed adoption candidates for the children.
 Specifically, Mother argues that the trial court abused its discretion by
not including in the jury charge her proposed instruction—i.e., “You are
instructed that you are not to consider the wealth of any person in answering
any question submitted to you by the court.”  The trial court denied the
requested instruction stating, “I agree with you that wealth alone should not
be a factor in this case, but I believe that that oversimplifies the issues in
the case as well.” 

         
We review a trial court’s decision to submit or refuse a particular instruction
under an abuse of discretion standard of review.  See In re V.L.K., 24 S.W.3d 338, 341
(Tex. 2000) (citing La.-Pac. Corp. v. Knighten,
976 S.W.2d 674, 676 (Tex. 1998)).  The trial
court has considerable discretion to determine necessary and proper jury
instructions.  See id. 

         
A parent’s rights cannot be terminated based on poverty without a showing that
the poverty has endangered the child.  See Doyle v. Tex. Dep’t of
Protective & Regulatory Servs., 16 S.W.3d 390, 398 (Tex. App.—El Paso 2000, pet.
denied).  Nor can a parent’s rights be terminated based on a foster
family’s ability to provide more than a biological parent can provide.  See
generally In re W.C., 98 S.W.3d 753, 758 (Tex.
App.—Fort Worth 2003, no pet.) (stating
that under best interest prong of section 161.001(2), termination should not be
used to merely reallocate children to better and more prosperous
parents).  

There
is a strong presumption that keeping a child with a parent is in the child’s
best interest.  In re R.R., 209 S.W.3d 112, 116 (Tex. 2006). 
Prompt and permanent placement of the child in a safe environment is also
presumed to be in the child’s best interest.  Tex. Fam.
Code Ann. § 263.307(a) (West 2008).  The following factors
should be considered in evaluating the parent’s willingness and ability to provide
the child with a safe environment:

(1) the child’s age and physical
and mental vulnerabilities;

(2) the frequency and nature of
out-of-home placements;

(3) the magnitude, frequency,
and circumstances of the harm to the child;

(4) whether the child has been
the victim of repeated harm after the initial report and intervention by the
department or other agency;

(5) whether the child is fearful
of living in or returning to the child’s home;

(6) the results of psychiatric,
psychological, or developmental evaluations of the child, the child’s parents,
other family members, or others who have access to the child’s home;

(7) whether there is a history
of abusive or assaultive conduct by the child’s family or others who have
access to the child’s home;

(8) whether there is a history
of substance abuse by the child’s family or others who have access to the
child’s home;

(9) whether the perpetrator of
the harm to the child is identified;

(10) the willingness and ability
of the child’s family to seek out, accept, and complete counseling services and
to cooperate with and facilitate an appropriate agency’s close supervision;

(11) the willingness and ability
of the child’s family to effect positive environmental and personal changes
within a reasonable period of time;

(12) whether the child’s family
demonstrates adequate parenting skills, including providing the child and other
children under the family’s care with:

(A) minimally adequate health
and nutritional care;

(B) care, nurturance, and
appropriate discipline consistent with the child’s physical and psychological
development;

(C) guidance and supervision
consistent with the child’s safety;

(D) a safe physical home
environment;

(E) protection from repeated
exposure to violence even though the violence may not be directed at the
child;  and

(F) an understanding of the
child’s needs and capabilities;  and

(13) whether an adequate social
support system consisting of an extended family and friends is available to the
child.

Id.
§ 263.307(b);
R.R., 209 S.W.3d at 116.

Other,
nonexclusive factors that the trier of fact in a termination case may use in
determining the best interest of the child include:

(A)     the desires of the child;

(B)     the emotional and physical needs of the child now and in the
future;

(C)     the emotional and physical danger to the child now and in
the future;

(D)     the parental abilities of the individuals seeking custody; 

(E)     the programs available to assist these individuals to promote
the best interest of the child;

(F)     the plans for the child by these individuals or by the
agency seeking custody;

(G)     the stability of the home or proposed placement;

(H)     the acts or omissions of the parent which may indicate that
the existing parent-child relationship is not a proper one; and

(I)      any
excuse for the acts or omissions of the parent.

Holley
v. Adams, 544 S.W.2d 367, 371–72 (Tex.
1976) (citations omitted).  A parent’s lack of
education, training, or misfortune, including poverty, falls within the final
category of factors enumerated in Holley, and is thus only one of the
factors to be considered by the trier of fact in determining the best interest
of the child.  In re S.H.A.,
728 S.W.2d 73, 89–90 (Tex. App.—Dallas 1987, writ ref’d n.r.e.).  

         
Here, the focus of the trial was not on Mother’s wealth or lack thereof but
rather on whether she, as a recovering drug addict living at a halfway house,
could provide for her children.  During the questioning of Chris’s mother,
who was caring for S.B.G.-R., it was clear that the
issue was not about who had more wealth but about whether Chris and Mother, who
were in jail and at a halfway house, respectively, could provide basic
necessities for the children:

         
Q.  Now, you were asked some questions about money, having money for
raising children.  Do you recall Mr. Trantham’s
questions about that?

 

         
A.  No, not really.

 

         
Q.  That you have the money and the resources to provide, to take
trips.  Do you recall that line of questions?

 

         
A.  Yes, uh-huh.

 

         
Q.  Wouldn’t you say as a parent that when you refer to money, that you’re
not talking about affluence.  You’re talking about money being necessary
to live on, to provide, eat, put a roof over your
head?

 

         
A.  Exactly.

 

         
Q.  Do you think those are necessities, basic necessities that a parent is
responsible for providing for their children?

 

         
A.  Yes.

 

         
Q.  And in testifying here to the jury today, wouldn’t you agree with me
that as your son and [Mother] sit in this courtroom, to the best of your
knowledge, they don’t have jobs, they don’t have money, and they don’t have a
roof over their head?

 

         
A.  That’s what I understand.

 

         
Q.  And do you think that as we sit here today, if the Court ordered the
children back into their custody, that you don’t know where they would live?

 

         
A.  No, I do not.

 

         
Q.  Or how they would feed those children?

 

         
A.  No. 

Because
under the section 263.307(b) factors and the Holley factors listed above
the jury was allowed to consider in making its best interest determination
whether Mother could provide her children with health and nutritional care and
a safe physical home environment and whether she could provide for her
children’s emotional and physical needs, which could be weighed against any
excuse (such as poverty) for her inability to provide, we hold that the trial
court did not abuse its discretion by denying Mother’s proposed jury
instruction to disregard the relative wealth of the parties.  See
Tex. Fam. Code Ann. § 263.307(b); Holley, 544 S.W.2d
at 371–72; S.H.A., 728 S.W.2d at 90–91 (despite parents’ poverty and low
intelligence, legally sufficient evidence supported best interest finding
because parents did not have the capacity or the ability to care for child); see
also In re T.N., 180 S.W.3d
376, 385 (Tex. App.—Amarillo 2005, no pet.) (citing S.H.A. and
holding that evidence was sufficient to support best interest finding because
evidence showed that mother’s drug use and demonstrated association with other
drug users constituted a danger emotionally and physically both in the present
and future).  We overrule Mother’s first issue.

V. 
Mother Lacks Standing to Challenge Ad Litem’s

Representation
of Child

         
In her fifth issue, Mother argues that S.I.-M.G.’s ad
litem “failed and refused to present her client’s legal position to the court.”[19]
 Mother contends that S.I.-M.G. was denied due
process of law because despite S.I.-M.G.’s requests
to have contact with Mother, the attorney ad litem “insisted that the best
interest of the child required termination.”  Mother further argues that
the attorney ad litem did not “have standing to advocate for termination on
behalf of the child.” 

         
Without citing any statutory or case law, Mother summarily states that she has
standing to bring this issue because she is “the mother of the child, best
friend, and only person able to make legal decisions for the child until those
powers were usurped by the State.”  We disagree.

         
A party may not complain of errors that do not injuriously affect her or that
affect only the rights of others.  In re T.N.,
142 S.W.3d 522, 524 (Tex. App.—Fort Worth 2004, no
pet.) (citing Tex.
Workers’ Comp. Ins. Fund v. Mandlbauer, 988 S.W.2d 750, 752 (Tex. 1999); Buckholts
ISD v. Glaser, 632 S.W.2d
146, 150 (Tex. 1982); Jackson v. Fontaine’s Clinics, Inc., 499 S.W.2d 87, 92 (Tex. 1973)).  An exception exists when
the appellant is deemed to be a party under the doctrine of virtual
representation, which requires among other elements that the appellant and the
children have identical interests.  Id. (citing Gunn v.
Cavanaugh, 391 S.W.2d 723, 725 (Tex.
1965)).  The record does not show that Mother and S.I.-M.G.
have identical interests, nor does Mother claim that they do.  Instead,
without presenting any evidence that Mother suffered harm from the ad litem’s representation of S.I.-M.G.,
Mother seeks to exploit the alleged deficiencies of the child’s counsel for her
own use on appeal.

         
Mother does not have standing on appeal to complain about the performance of
the child’s attorney on the child’s behalf.  At the time of the trial, CPS
had temporary managing conservatorship, including the right to represent the
child in a legal action and to make other decisions of substantial legal
significance concerning the child.  See Tex. Fam. Code Ann.
§ 153.371(8) (West 2008).  Mother did not have that right then, nor
does she now on appeal.  Further, Mother has no standing to complain about
the child’s lawyer on her own behalf.  See T.N.,
142 S.W.3d at 524 (citing Mandlbauer,
988 S.W.2d at 752; Glaser, 632 S.W.2d at 150; Jackson, 499 S.W.2d
at 92; see also In re Frank L., 97 Cal. Rptr. 2d 88, 90, 81 Cal. App. 4th 700, 703 (Cal. Ct. App. 2000)
(holding that parents must actually make a showing that ineffective assistance
of the children’s attorney affected the parents’ interest to have standing to
raise the claim)).[20] 
Because Mother lacks standing to complain about the child’s attorney ad litem,
we overrule Mother’s fifth issue.

VI.  Conclusion

         
Having overruled every issue necessary for disposition of this appeal, we
affirm the trial court’s judgment terminating Mother’s parental rights to S.I.-M.G. and S.B.G.-R.

 

 

SUE WALKER
JUSTICE

 

PANEL: 
WALKER, MCCOY, and GABRIEL, JJ.

 

DELIVERED:  November
15, 2012














[1]See
Tex. R. App. P. 47.4.





[2]Prior
to her arrest on the two aggravated robbery charges, Mother had been convicted
of possession of marijuana and DWI. 





[3]Detective
Buchanan noted that a welfare concern call had also come in on January 24,
2008. 





[4]The
grandmother told Detective Buchanan that she had been caring for S.I.-M.G. since December 2007 because Mother was in jail on a
robbery charge. 





[5]After
Chris was arrested, Mother decided that she could not do drugs anymore and
tried to quit, which caused a “near miscarriage.”





[6]Matthews
later learned from the hospital that Mother did not leave her purse there; she
left her discharge papers. 





[7]S.B.G.-R. was born premature but did not experience
symptoms of premature birth. 





[8]There
was conflicting testimony on this symptom:  Matthews listed “trouble
eating” as one of S.B.G.-R.’s withdrawal symptoms,
but Evans said that S.B.G.-R. was
eating well.





[9]There
is no evidence that Mother was directly asked about this fact and failed to
provide the information.





[10]Mother
had told Pounds that Chris’s heroin addiction was a problem in their
relationship and that was why she struggled with staying with him. 





[11]There
was no evidence that a child was exposed to the heroin found on May 19, 2011;
all of the children’s things in the apartment were packed up because the
children had been removed by the Department. 





[12]Dea Davis, a CPS caseworker, testified that a month’s worth
of clean drug tests in December 2011 to January 2012 did not show a pattern of
being able to remain drug-free. 





[13]Crosley-Culberson testified that there is a high
probability of relapse within the first year. 





[14]Although
Storm defined “CJAD” as the “criminal justice
department out of Austin,” it is more commonly known as the Community Justice
Assistance Division.





[15]Compare
Elbaor v. Smith, 845 S.W.2d
240, 243 (Tex. 1992) (stating that objection to question in jury charge is
challenge to legal sufficiency), and Cont’l
Coffee Prods. Co. v. Cazarez,
937 S.W.2d 444, 450 (Tex. 1996) (stating that
anything more than a scintilla of evidence is legally sufficient to support a
jury finding), with Tex. Fam. Code Ann. §§ 161.001, .206(a) (requiring
termination decisions to be supported by clear and convincing evidence).





[16]From
these cases it is clear that prescription drug abuse has been treated as
endangering conduct equal with illegal drug abuse and will support a finding of
endangering conduct under subsection (E).  See T.D.L.,
2006 WL 302126, at *7–8 (holding evidence legally sufficient to support trial
court’s subsection (E) finding because evidence revealed that mother’s prior
course of conduct regarding her continuous misuse of prescription drugs
demonstrated that she had endangered her children’s well-being; although mother
had tested positive for marijuana and cocaine on two occasions, the emphasis
throughout the analysis was on mother’s continuous abuse of prescription
drugs).  We therefore continue to follow the prior precedent of this
court.





[17]Mother
does not challenge the sufficiency of the evidence supporting the subsection
(E) finding.  Even if such a challenge had been made, based on the
evidence and case law set out above, it would not result in a reversal as the
record demonstrates that the jury’s subsection (E) finding is supported by
clear and convincing evidence of Mother’s conduct—including abuse of
prescription drugs and illegal drug use, limited prenatal care, and
imprisonment—that endangered the physical or emotional well-being of S.B.G.-R.  





[18]Along
with a best interest finding, which we discuss below, a finding of only one
ground alleged under section 161.001(1) is sufficient to support a judgment of
termination.  See In re E.M.N., 221 S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.). 
Because we hold that the evidence supports the termination of Mother’s parental
rights under section 161.001(1)(E), we need not address Mother’s second issue
challenging the section 161.001(1)(O) finding or Mother’s third issue
challenging the submission of the section 161.001(1)(D) jury question.  See
Tex. R. App. P. 47.1 (stating that appellate court need address every issue
necessary for final disposition of appeal).





[19]The
attorney ad litem represented both S.I.-M.G. and S.B.G.-R.  On appeal, Mother challenges only the
attorney ad litem’s representation of S.I.-M.G.  This is the only challenge that Mother makes to
the termination of her parental rights to S.I.-M.G.





[20]Moreover,
assuming in the alternative that Mother did have standing to complain about S.I.-M.G.’s ad litem, Texas Family Code section 107.008
states that an attorney ad litem may determine that the child cannot
meaningfully formulate the child’s objectives of representation and, in that
case, may present to the court a position that the attorney determines will
serve the best interest of the child.  Tex. Fam. Code
Ann. § 107.008(a)–(b) (West 2008).